UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

   -v-                            :

SWISS LIFE HOLDING AG,            :
SWISS LIFE (LIECHTENSTEIN) AG,
SWISS LIFE (LUXEMBOURG) S.A., and :
SWISS LIFE (SINGAPORE) PTE. LTD., :

                      :

          Defendants.           :

- - - - - - - - - - - - - - - - - x

<u>INFORMATION</u>

21 Cr. 327

## <u>COUNT ONE</u>
**(Conspiracy to Defraud the United States)**

The United States Attorney charges:

### <u>The SWISS LIFE Companies</u>

1.  SWISS LIFE HOLDING AG, the defendant, is the
ultimate parent company of the SWISS LIFE group of companies, a
Switzerland-based provider of comprehensive life insurance and
pension products for individuals and corporations, as well as
asset-management and financial-planning services.  SWISS LIFE
was founded in 1857 as an insurance cooperative providing
insurance to Swiss-located businesses.  It is Switzerland's
oldest life insurance company and the leading provider of life
insurance and pension products in the domestic Swiss market, its
most important market.  SWISS LIFE has over 9,000 employees and
services more than 4,000,000 customers.  As of 2019, SWISS LIFE

had approximately $300 billion in assets under control, the vast bulk of which were "tied" to customer policies and accounts. SWISS LIFE is registered and headquartered in Zurich and trades on the Swiss stock exchange SIX under the symbol "SLHN."

2.   At all times relevant to this Information, SWISS LIFE HOLDING AG, the defendant, provided certain insurance policies and other services as described more fully herein to individuals and entities around the world through affiliated carriers SWISS LIFE (LIECHTENSTEIN) AG ("SWISS LIFE LIECHTENSTEIN"), SWISS LIFE (SINGAPORE) PTE. LTD. ("SWISS LIFE SINGAPORE"), and SWISS LIFE (LUXEMBOURG) S.A. ("SWISS LIFE LUXEMBOURG") (collectively with SWISS LIFE HOLDING AG, "SWISS LIFE" unless otherwise indicated), the defendants, including U.S. taxpayers in the Southern District of New York.  SWISS LIFE HOLDING AG is responsible for the federal criminal violations charged in this Information as a result of the acts alleged herein by its officers, directors, employees and agents, including SWISS LIFE LIECHTENSTEIN, SWISS LIFE SINGAPORE and SWISS LIFE LUXEMBOURG.  Similarly, SWISS LIFE LIECHTENSTEIN, SWISS LIFE SINGAPORE and SWISS LIFE LUXEMBOURG are responsible for the federal criminal violations charged in this Information as a result of the acts alleged herein by their respective officers, directors, employees, and agents.

**Obligations of United States Taxpayers
With Respect to Foreign Financial Accounts**

3.   U.S. taxpayers who have income (including
interest, dividends or capital gains) in any given calendar year
in excess of a threshold amount are required to file a U.S.
Individual Income Tax Return, Form 1040 ("tax return"), for that
calendar year with the Internal Revenue Service ("IRS") by April
15 of the following year.  On that tax return, U.S. taxpayers
must report their worldwide income, including all income earned
from foreign bank accounts, and U.S. taxpayers are required to
pay the taxes due on that income to the IRS.  Since tax year
1976, U.S. citizens and resident aliens have had an obligation
to report to the IRS whether they had a financial interest in,
or signature authority over, a financial account in a foreign
country in a particular year on Schedule B of their tax return
by checking "Yes" or "No" in the appropriate box and identifying
the country where the account was maintained.

4.   Since 1970, U.S. citizens, resident aliens, and
legal permanent residents who have a financial interest in, or
signatory authority over, one or more financial accounts in a
foreign country with an aggregate value of more than $10,000 at
any time during a particular year have been required to file
with the U.S. Department of Treasury a Report of Foreign Bank
and Financial Accounts, FinCEN Form 114 (formerly known as "Form

3

TD F 90-22.2"), commonly referred to as an "FBAR."  In 2010, the
Department of Treasury clarified, by regulation, the requirement
that persons subject to U.S. income taxation were required to
disclose, on an FBAR, their financial interests held in foreign
insurance policies with cash value.  During the period from 2005
to 2014 (the "Applicable Period"), an FBAR for a particular tax
year was required to be filed on or before June 30 of the
following year.

5.   For all tax years since 2011, U.S. citizens,
resident aliens, and legal permanent residents who held foreign
financial and certain other foreign assets ("Reportable Foreign
Assets") in excess of $50,000 at the end of the relevant tax
year (or $75,000 at any point during the tax year) were required
to file a Form 8938 disclosing such assets, including the
account number and financial institution where the assets were
held.  Reportable Foreign Assets include foreign life insurance
policies or annuities with cash surrender value.  U.S. taxpayers
residing abroad and paying taxes in a foreign jurisdiction are
still required to file a Form 8938 but the reportable foreign
assets thresholds are higher.  As a general matter, a Form 8938
is filed with a taxpayer's Form 1040 tax return.

6.   In addition, U.S. citizens, resident aliens, and
legal permanent residents are required to pay a one-time 1%
excise tax on the contributions to a foreign insurance policy,

including those policies sold by the SWISS LIFE affiliated carriers.  Since at least 1967, U.S. persons have been required to report contributions to a foreign insurance policy and their payment of the excise tax associated with those contributions on a Form 720.

7.   An IRS Form W-9, Request for Taxpayer Identification Number and Certification, is used by a U.S. person to provide a correct Taxpayer Identification Number to a financial institution that is required to report to the IRS all interest, dividends, and other earned income.

8.   An "undeclared policy" was a policy held and/or beneficially owned by an individual subject to U.S. taxation and maintained in a foreign country that had not been reported by the individual holder and/or beneficial owner to the U.S. government on an income tax return or other applicable form, such as an FBAR, Form 8938, or Form 720, as required.

9.   An "undeclared account" refers to a financial account owned and/or beneficially owned by a U.S. taxpayer and maintained in a foreign country that had not been reported by the individual account owner and/or beneficial owner to the U.S. government on a tax return or FBAR.

**SWISS LIFE's Private Placement Life Insurance Business**

10.   In or about the beginning of 2005, SWISS LIFE HOLDING AG, the defendant, launched a Private Placement Life

Insurance ("PPLI") business with the establishment of an
insurance carrier subsidiary in Liechtenstein -- SWISS LIFE
LIECHTENSTEIN, the defendant.  The PPLI business focused on high
net worth and ultra-high net worth clients.  Unlike ordinary
life insurance, PPLI products contained an investment component,
comprising the "premiums" or contributions to the policy
investment account, which is typically managed by an external
asset manager, and an insurance component, such as life
insurance or an annuity benefit.  The investment component of a
PPLI policy was held through an individual policy investment
account custodied at a non-U.S. bank.  The policy investment
account was held in the name of the affiliated SWISS LIFE
carrier that issued the policy, rather than the ultimate
beneficial owner of the policy.  These products are sometimes
referred to as "insurance wrappers" because the insurance
component is "wrapped" around the investment component -- i.e.,
the policy investment account.  At or about the same time, SWISS
LIFE HOLDING AG, the defendant, also began offering PPLI
products through its wholly owned Luxembourg insurance carrier,
SWISS LIFE LUXEMBOURG, the defendant, which had historically
focused on corporate employee benefit solutions and traditional
life insurance.

        11.  In 2007, SWISS LIFE HOLDING AG, the defendant,
expanded its PPLI business through the acquisition of

CapitalLeben Versicherung AG, a Liechtenstein insurance carrier, and its existing book of business, which included approximately 1,000 policies, with premium contributions of approximately $220 million, that were held or beneficially owned by U.S. persons ("U.S.-related Policies").  The majority of the U.S.-related Policies were smaller in size, with less than $100,000 each in total premium contributions.  The CapitalLeben business was integrated into SWISS LIFE LIECHTENSTEIN, the defendant, by in or about the beginning of 2008.

      12.  SWISS LIFE HOLDING AG, the defendant, further expanded its PPLI business in 2008 through the establishment by SWISS LIFE LIECHTENSTEIN, the defendant, of SWISS LIFE SINGAPORE, the defendant, as its branch in Singapore, which transitioned into an independent insurance carrier in 2009. During the Applicable Period, the PPLI products were offered through these three carriers: SWISS LIFE LIECHTENSTEIN, SWISS LIFE SINGAPORE, and SWISS LIFE LUXEMBOURG, the defendants (collectively, the "SWISS LIFE PPLI CARRIERS").  Each of the SWISS LIFE PPLI CARRIERS had its own Board of Directors, management, and sales and other personnel.  The SWISS LIFE PPLI CARRIERS formed a business unit that was led by the senior leadership of SWISS LIFE LIECHTENSTEIN, the defendant, along with the heads of SWISS LIFE SINGAPORE and SWISS LIFE LUXEMBOURG, the defendants (the "PPLI Business Unit").

## The PPLI Business Model and Relevant Parties

13.  SWISS LIFE's PPLI business was fundamentally a business-to-business ("B2B") model.  The SWISS LIFE PPLI CARRIERS generally did not sell PPLI products directly to policyholder clients, but rather worked through intermediaries like banks, external asset managers, and family offices that maintained relationships with the actual or potential policyholder clients, including U.S. clients.  The intermediary-client relationships often predated the acquisition of a SWISS LIFE PPLI policy, for example where a client's assets had been held and managed at a Swiss bank for many years prior to the purchase of a SWISS LIFE PPLI policy.  In some cases, sales personnel from the SWISS LIFE PPLI CARRIERS had limited or even no contact with a prospective policyholder, while in other cases PPLI sales personnel would join an intermediary to meet with the prospective policyholder, including to explain the benefits and features of SWISS LIFE's PPLI policies.

14.  Potential intermediary partners approached a SWISS LIFE PPLI CARRIER to inquire generally about PPLI products or specifically with regard to clients they believed might be interested in SWISS LIFE's PPLI products, and a SWISS LIFE PPLI CARRIER also approached potential partners to inquire if they had existing clients who were prospects or otherwise might be interested in promoting SWISS LIFE's PPLI products to potential

clients.  Sometimes sales personnel from the SWISS LIFE PPLI
CARRIERS would also have their own leads or receive referrals
that did not involve a potential client with an already existing
intermediary relationship.

15.  Each PPLI policy required the opening of an
individual policy investment account at a bank.  Each such
account was titled in the name of the SWISS LIFE PPLI CARRIER
issuing the respective PPLI policy, but the assets used to fund
the policy (i.e., the "premium" payment or contribution) were
transferred from one or more accounts beneficially owned by the
policyholder or underlying beneficial owner of the policy, and
frequently from undeclared assets in offshore accounts.

16.  The assets in each PPLI policy investment
account, while titled in the name of the SWISS LIFE PPLI
CARRIER, were managed by an external asset manager for the
benefit of the policyholder, through powers of investment that
were given by the SWISS LIFE PPLI CARRIER to the external asset
manager.  The policyholder could request a specific asset
manager be appointed, and often had a pre-existing relationship
with the asset manager, which frequently served as the
intermediary for issuance of the policy.  The custodian bank
holding the policy investment account could also be appointed to
serve as the external asset manager for a PPLI policy.

17.   The fees associated with the issuance and ongoing maintenance of a SWISS LIFE PPLI policy were the "establishment" fee and the "administration" fee.  The establishment fee was an upfront charge based on a contractually determined percentage of the initial policy premium (and any subsequent premium contribution), and generally ranged from 1 to 3% of premium contributions (although the fee could be higher or lower for a particular policy).  The administration fee was an ongoing fee paid on a quarterly or other periodic basis to the SWISS LIFE PPLI CARRIER that issued the policy, based on a contractually determined percentage of the policy's assets-under-control value, and generally ranged from 0.5 to 1.5% of the assets under control value (although this fee also could be higher or lower for a particular policy).  Consistent with the B2B model for SWISS LIFE's PPLI business, the establishment and administration fees were (i) typically shared between the SWISS LIFE PPLI CARRIERS and the third-party intermediary involved in originating a policy based on a pre-determined split, and (ii) often set by intermediaries involved in policy origination subject to certain minimum guidelines for SWISS LIFE's share of these fees set by the SWISS LIFE PPLI CARRIERS.

### Overview of the Conspiracy

18.   From at least in or about January 2005 through in or about December 2014, SWISS LIFE HOLDING AG, SWISS LIFE

LIECHTENSTEIN, SWISS LIFE LUXEMBOURG, and SWISS LIFE SINGAPORE,
the defendants, willfully and knowingly conspired and agreed
with U.S. taxpayers (hereinafter, "U.S. taxpayer-clients"),
certain custodian bank senior executives and relationship
managers, and third-party intermediaries to conceal from the IRS
the existence of undeclared policies and related undeclared
policy investment accounts incepted by the SWISS LIFE PPLI
CARRIERS and the income earned in such accounts, and to evade
U.S. taxes due on the income generated in the undeclared policy
investment accounts.

## Means and Methods of the Conspiracy

19.   SWISS LIFE HOLDING AG, SWISS LIFE LIECHTENSTEIN,
SWISS LIFE LUXEMBOURG, and SWISS LIFE SINGAPORE, the defendants,
and their co-conspirators, carried out the conspiracy through,
among others, the following means and methods:

a.   SWISS LIFE PPLI CARRIERS' employees incepted
and managed undeclared policies and related undeclared policy
investment accounts for U.S. taxpayer-clients that were not
reported to the IRS on Forms 1040, Forms 8938, Forms 720, FBARs,
or otherwise, and the income from which was also not reported to
the IRS.

b.   In 2008 and 2009, certain SWISS LIFE PPLI
sales personnel pursued banks, asset managers, and other
intermediaries who had U.S. clients seeking to open SWISS LIFE

11

PPLI policies with assets that were known to be undeclared to the IRS, often because they were concerned about their existing offshore bank accounts or structures given increasing cross-border tax enforcement efforts by U.S. authorities or were being forced to leave by their existing offshore banks.  In doing so, U.S. clients with undeclared assets were typically referred to by the SWISS LIFE PPLI CARRIERS as U.S. "NCAS" -- short for "non-comprehensive advice seeking" clients.

       c.   The SWISS LIFE PPLI CARRIERS assisted in opening and maintaining undeclared policy investment accounts in the carriers' names at dozens of offshore custodial banks for the benefit of U.S. taxpayer-clients.

       d.   The SWISS LIFE PPLI CARRIERS accepted referrals from third-party intermediaries, for the purpose of incepting undeclared life insurance policies and the related undeclared policy investment accounts that were titled in the name of the respective SWISS LIFE PPLI CARRIER.

       e.   The SWISS LIFE PPLI CARRIERS worked with bank relationship managers and third-party intermediaries to service the U.S. taxpayer-clients with respect to their undeclared insurance policies and the related policy investment accounts.

       f.   During the first seven months of 2009, certain SWISS LIFE LIECHTENSTEIN sales personnel promoted a

specific use of SWISS LIFE LIECHTENSTEIN's U.S. tax-compliant
PPLI products to a number of Swiss banks that had undeclared
U.S. clients who might be interested in continuing to keep their
assets undeclared and offshore notwithstanding the U.S.
government's increased cross-border tax enforcement efforts.
Pursuant to the approach, so-called turning "black money" into
"white," a U.S. taxpayer with undeclared assets held in a Swiss
bank account (and documented at the bank as beneficially owned
by the U.S. taxpayer) would transfer the undeclared assets into
a PPLI policy using one of the U.S. tax-compliant PPLI products
offered by the SWISS LIFE PPLI CARRIERS.  In doing so, the U.S.
taxpayer's undeclared assets would thereafter be custodied in a
policy investment account held at the same (or, if preferred, a
different) Swiss bank in the name of one of the SWISS LIFE PPLI
CARRIERS instead of the name of the U.S. taxpayer-client.  The
U.S. taxpayer would then keep the PPLI policy in force until
after the perceived expiration of the statute of limitations for
criminal tax liability under U.S. law.

       g.    SWISS LIFE LIECHTENSTEIN and SWISS LIFE
SINGAPORE each used a so-called "premium account" -- a bank
account in the name of the respective carrier -- to receive
premium funding payments from U.S. taxpayer-clients so that
their policy investment accounts would not receive the premium
funding payments directly from the clients.  SWISS LIFE

LIECHTENSTEIN and SWISS LIFE SINGAPORE used Liechtenstein Bank-1 and Swiss Bank-5, respectively, to custody their premium accounts.

h.   The SWISS LIFE PPLI CARRIERS entered into referral and other agreements with third-party intermediaries to split the fees earned on the undeclared insurance policies of U.S. taxpayer-clients.

i.   SWISS LIFE SINGAPORE entered into a referral arrangement with Singapore Trust Company-1, which had developed a strategy using a complex web of offshore trust and corporate entities to conceal the U.S. taxpayer-clients' beneficial ownership in SWISS LIFE SINGAPORE PPLI policies.

j.   The SWISS LIFE PPLI CARRIERS assisted in the termination of policies for U.S. taxpayer-clients in ways designed to maintain the veil of secrecy over the U.S. taxpayer-clients' undeclared policies and related policy investment accounts, such as causing surrender payments to be transferred to other offshore accounts belonging to the U.S. taxpayer-client and to be used to purchase diamonds for the U.S. taxpayer-client.

k.   Various U.S. taxpayer-clients of the SWISS LIFE PPLI CARRIERS, including U.S. taxpayer-clients in the Southern District of New York, filed false Forms 1040 and other required tax forms, electronically and via U.S. mail, that

14

failed to report their interest in, and income earned on, their undeclared SWISS LIFE PPLI policies and related policy investment accounts; evaded income taxes due and owing; and failed to file FBARs identifying their undeclared policies and related policy investment accounts.

### Statutory Allegations

20.   From at least in or about January 2005 through in or about December 2014, in the Southern District of New York and elsewhere, SWISS LIFE HOLDING AG, SWISS LIFE LIECHTENSTEIN, SWISS LIFE LUXEMBOURG, and SWISS LIFE SINGAPORE, the defendants, together with others known and unknown, willfully and knowingly did conspire, combine, confederate, and agree together and with each other to defraud the United States of America and an agency thereof, to wit, the IRS, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201 and 7206(1).

21.   It was a part and object of the conspiracy that SWISS LIFE HOLDING AG, SWISS LIFE LIECHTENSTEIN, SWISS LIFE LUXEMBOURG, and SWISS LIFE SINGAPORE, the defendants, together with others known and unknown, willfully and knowingly would and did defraud the United States of America and the IRS for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit,

federal income taxes.

22.  It was further a part and an object of the conspiracy that SWISS LIFE HOLDING AG, SWISS LIFE LIECHTENSTEIN, SWISS LIFE LUXEMBOURG, and SWISS LIFE SINGAPORE, the defendants, together with others known and unknown, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income tax due and owing to the United States of America by certain of the defendants' U.S. taxpayer-clients, in violation of Title 26, United States Code, Section 7201.

23.  It was further a part and an object of the conspiracy that various U.S. taxpayer-clients of SWISS LIFE HOLDING AG, SWISS LIFE LIECHTENSTEIN, SWISS LIFE LUXEMBOURG, and SWISS LIFE SINGAPORE, the defendants, together with others known and unknown, willfully and knowingly would and did make and subscribe income tax returns, statements, and other documents, which contained and were verified by written declarations that they were made under the penalties of perjury, and which these U.S. taxpayer-clients, together with others known and unknown, did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

## **Overt Acts**

24.  In furtherance of the conspiracy and to effect the illegal objects thereof, SWISS LIFE HOLDING AG, SWISS LIFE

16

LIECHTENSTEIN, SWISS LIFE LUXEMBOURG, and SWISS LIFE SINGAPORE, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

      a.   On or about July 22, 2008, a PPLI sales supervisor sent an email to senior sales personnel from the PPLI Business Unit in response to the recent announcement of the U.S. government's investigation of UBS, stating, "We do continue to promote our solutions for US-clients . . . ."

      b.   On or about August 26, 2008, the same PPLI sales supervisor relayed to senior sales personnel that a competitor, Liechtenstein Insurance Provider-1, had stopped doing business with U.S. clients and noted, "This is obviously an opportunity for us."

      c.   On or about November 25, 2008, when a SWISS LIFE LIECHTENSTEIN salesperson asked whether SWISS LIFE LIECHTENSTEIN still accepted U.S. NCAS clients, the same sales supervisor responded that SWISS LIFE LIECHTENSTEIN accepted such clients "as long as we find a custodian bank."

      d.   On or about February 13, 2009, SWISS LIFE SINGAPORE employees and salespersons discussed the need to remove U.S. client identifiers from mail. One participant stated, "My only concern is when client data (i.e. name + address) are sent around via mail for an NCAS client, especially

if it's a US one (both the case here . . .).  If sent by mail, the name + address of client must be removed first to ensure privacy + avoid other/sincere legal problems. . . ."

       e.   On or about April 23, 2009, SWISS LIFE SINGAPORE and Singapore Trust Company-1 executed a referral agreement whereby Singapore Trust Company-1 agreed to market SWISS LIFE PPLI products in exchange for referral fees.  Those fees varied depending on the specific product sold and the size of the premium but reached as high as 9% of the premium amount all-in for the client, with SWISS LIFE SINGAPORE receiving approximately one-half of the quarterly administration fee and approximately one-fifth to one-third of the one-time establishment fee.

       f.   On or about July 2, 2009, a salesperson for SWISS LIFE LIECHTENSTEIN met with a representative of a Swiss fiduciary firm to discuss SWISS LIFE's PPLI products for the fiduciary firm's undeclared U.S. taxpayer-clients.

       g.   On or about July 3, 2009, a representative of Singapore Trust Company-1 outlined to a SWISS LIFE LIECHTENSTEIN salesperson the use of a "purpose trust" structure to hold a U.S. client's SWISS LIFE PPLI policy and the use of "long-term loans" to the client to cloak partial surrender payments as non-taxable distributions.

h.   On or about November 9, 2009, SWISS LIFE
SINGAPORE sent a letter to Swiss Bank-5, instructing it to
forward almost €45 million from SWISS LIFE SINGAPORE's premium
account at Swiss Bank-5 to the U.S. taxpayer-client's policy
investment account at Swiss Bank-5 as an initial contribution
for an insurance wrapper policy.

i.   On or about November 9, 2009, an employee of
Swiss Bank-5 emailed an employee of SWISS LIFE SINGAPORE and an
employee of Singapore Trust Company-1, confirming that Swiss
Bank-5 had "received today the funds back (i.e. Eur 45 mio) . .
. ."

j.   On or about February 12, 2010, SWISS LIFE
SINGAPORE sent an account statement for a U.S. taxpayer-client
with an $8.6 million policy investment account to the third-
party intermediary handling the client relationship.

k.   On or about February 12, 2010, SWISS LIFE
SINGAPORE sent an account statement for a U.S. taxpayer-client
with a $63.8 million policy investment account to the third-
party intermediary handling the client relationship.

l.   On or about March 16, 2010, SWISS LIFE
LIECHTENSTEIN sent an account statement for a U.S. taxpayer-
client with a $1.6 million policy investment account to the
third-party intermediary handling the client relationship.

m.   On or about July 17, 2012, a SWISS LIFE SINGAPORE employee approved a U.S. taxpayer-client going forward with a "top-up" or new contribution of EUR 44 million into his insurance wrapper account held at Swiss Bank-13.

n.   In or about February 2013, a U.S. policyholder of a SWISS LIFE LIECHTENSTEIN PPLI policy ("USPH-1") requested a full surrender in order to purchase diamonds. USPH-1's stated reason for the surrender request was the belief that "investing in diamonds is better for US citizens."

o.   In or about February 2013, USPH-1's policy assets of approximately $470,000 were transferred to an account held at Swiss Bank-20, the assets were exchanged for diamonds, and USPH-1 and their spouse picked up the gemstones in person during a trip to Zurich.

(Title 18, United States Code, Section 371.)

*Audrey Strauss*

_____
AUDREY STRAUSS
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**v.**

**SWISS LIFE HOLDING AG,**
**SWISS LIFE (LIECHTENSTEIN) AG,**
**SWISS LIFE (LUXEMBOURG) S.A.,**
**SWISS LIFE (SINGAPORE) PTE. LTD.,**

**Defendants.**

---

**INFORMATION**

**21 Cr. ___**

**(18 U.S.C. § 371)**

---

AUDREY STRAUSS
United States Attorney.

---